SINCLAIR *v.* BRUNSON.

1. PHYSICIANS AND SURGEONS—MALPRACTICE — EVIDENCE — EXPERT
   WITNESSES—HEARSAY.
   In an action for malpractice, whereby plaintiff claimed to
   have suffered the loss of a leg, but which defendants
   claimed was caused by *endarteritis obliterans*, it was error
   for the trial court to permit a medical witness for de-
   fendants to testify as to the contents of a medical publica-
   tion in regard to the prevalence of said disease without
   laying the proper foundation therefor, especially since the
   apparent purpose was to discredit the testimony of a
   medical witness for plaintiff.

2. SAME—DEFENSES—NEGLECT OF PATIENTS—LIABILITY.
   That a doctor has taken on so many patients that he has to
   neglect some, *held*, not to excuse him from responsibility
   if harm results from such neglect.

3. TRIAL—JURY TO DRAW CONCLUSIONS.
   It is for the jury, and not the witness, to draw conclusions
   from testimony previously offered.

Error to Allegan; Cross (Orien S.), J.   Submitted
October 13, 1920.   (Docket No. 56.)   Decided Decem-
ber 21, 1920.

Case by Aaron Sinclair against Eugene E. Brunson
and another for malpractice.   Judgment for defend-
ants.   Plaintiff brings error.   Reversed.

*William C. McHenry, Charles Thew* and *John M.
Dunham,* for appellant.

*Douglas, Eaman, Barbour & Rogers* and *Clare E.
Hoffman,* for appellees.

MOORE, C. J.   This is a case brought to recover dam-
ages for alleged malpractice.   The calendar entries

On liability of physician as affected by other calls on his
services, see note in L. R. A. 1916B, 625.

show there was a trial in March, 1919, resulting in a verdict in favor of the plaintiff in the sum of $4,000. A new trial was granted which resulted October 25, 1919, in a verdict for the defendants. From a judgment entered on the verdict the case is here on writ of error.

Counsel for appellant discuss the assignments of error under 7 heads, some of which have various subdivisions. We have gone over all of them carefully but shall not attempt to discuss all of them.

Plaintiff had a corn removed from one of his toes. This was followed by the toe getting very sore. He consulted the defendants, father and son, who are country physicians. After treating the toe for a little time they amputated it. It is the claim of the plaintiff that proper care was not given the toe and that as a result thereof infection set in, making it necessary later to amputate the leg just below the hip. The defendants denied they had not properly treated the toe; they denied all neglect, and assert that plaintiff was suffering from a disease called *endarteritis obliterans,* for which there is no cure, and that the amputation of the leg was the inevitable result of this disease regardless of treatment given, and that, therefore, the defendants are in no way responsible for the loss of the plaintiff's leg.

There was testimony tending to support each of these conflicting claims. There were medical experts on both sides who testified, and, as sometimes happens, they did not agree about the case or as to how *endarteritis obliterans* affects the patient. One of the experts for the plaintiff testified in substance that if the disease existed at all it would affect all the arteries. On the other side, it was claimed it might stop up some of the arteries without affecting the others. At this point it may be well to refer to a statement of counsel for the appellant, which is as follows:

"Assignments of error numbers 25 to 29, inclusive, are based upon what we believe to be the most prejudicial proceeding ever allowed in a court of law.   During the trial of this case, and on Thursday evening, a man died in his automobile upon the streets of Allegan.   On the following morning a *post-mortem* was performed by a local doctor, assisted by the witness, Dr. Robinson, and shortly before the testimony was concluded on Friday afternoon Dr. Robinson was allowed, over objections, to relate the condition of this man, the fact that in the opinion of the witness, the man had died of '*endarteritis obliterans*,' and to offer in evidence a portion of the aorta, the femoral artery and possibly other parts of the dead man's body.   Nor was this all.   The court, in order that each of the jurors might see the condition of these arteries, invited those who had not been given a good look, to step out of the jury box and examine them.   The witness Robinson even handed his forceps to some of the jurors who were asked to turn over these gruesome exhibits.

"Allegan is a small city.   It is not impossible nor improbable that every member of this jury knew the man who had so suddenly died.   To have part of his body brought in as an exhibit in a law suit of which he never heard, and in which the dead man had no interest, and to be asked to examine and to feel of part of the body of possibly a friend whom they may have seen within twenty-four hours, alive and in the flesh, was, in our opinion, the most horrifying, the most gruesome, the most prejudicial proceeding which has ever taken place in any court.   We find no authority justifying such a thing, and we do not believe that defendants' counsel will be able to find any."

Counsel for the appellees say that what was done was done by way of illustration to show that the disease did not affect the patient as was claimed by the witnesses for the plaintiff.   The proceeding was a very unusual one, and as the case must be reversed for other reasons, and as on the new trial there is not likely to be a repetition of the alleged error, we will not express an opinion as to whether it was reversible error.

A Chicago doctor had testified as to his treatment of cases of *endarteritis obliterans,* and the prevalence of the disease in Chicago. The record shows the following occurred:

"*Q.* Now, Doctor, it has been testified to by Dr. Tenny that he treated 25 or 30 cases of *endarteritis obliterans* which demanded special attention, and that the number of patients which he has had, which did not require special treatment would run into the hundreds. Have you had occasion recently to examine the Murphy Clinic of Chicago?

"*A.* Yes, sir.

"*Q.* What is that Murphy Clinic?

"*A.* It is a publication originally published by John B. Murphy of Chicago.

"*Q.* And since his death the publication continues and surgeons connected with the various hospitals in Chicago contribute articles to the book?

"*A.* Yes, what is called the Murphy Clinics.

"*Q.* Have you seen a report of the cases of *endarteritis obliterans* as set forth in the Murphy Clinics?

"*Mr. Dunham:* I object to that.

"*Q.* Have you seen those reports here?

"*A.* No.

"*Q.* Have you read them?

"*A.* Yes, sir.

"*Q.* You are familiar with them?

"*A.* Yes.

"*Q.* But you cannot produce them here now?

"*A.* No.

"*Mr. McHenry:* That is no proper showing for this kind of testimony and we object to it.

"*Mr. Barbour:* We will abide by the ruling of the court.

"*Mr. Dunham:* It is not the best evidence.

"*Mr. Barbour:* It is not the best evidence, but I cannot produce the best evidence.

"*The Court:* Well, you may take the answer.

"*Q.* State, Doctor, how many cases of that disease are reported in Chicago in the Murphy Clinics?

"*A.* I am not sure whether it is five or six, or three or four, and I cannot recall the name of the man who reports them.

"*Q.* How do you account for this large epidemic of this very disease that Dr. Tenny has found in Chicago?

"*A.* I don't know. I think the doctor is confused and is taking something entirely different. He was talking about *arterio sclerosis*, which is an entirely different condition."

Counsel for the appellees now say:

"We wish to draw the attention of the court to the fact that the Murphy Clinics, as referred to, were not used for the purpose of giving an opinion, but were used simply for the purpose of furnishing statistics as to the frequency of the disease. The court is entitled to know the results of all investigations concerned with the subject-matter of the suit, and where it is obviously impossible to have the author of an investigation before a court, the statistics prepared by the author, may properly be introduced in evidence."

It is difficult to sustain this theory when there was no foundation laid as by showing how the Murphy Clinics came into existence or what field they covered. The witness testified "I cannot recall the name of the man who reports them." The purpose of introducing this testimony is indicated by the following:

"*Q.* How do you account for this large epidemic of this very disease that Dr. Tenny has found in Chicago?

"*A.* I don't know. I think the doctor is confused and is taking something entirely different. He was talking about *arterio sclerosis*, which is an entirely different condition."

It was not for the witness to draw conclusions in relation to Dr. Tenny, but for the jury. The admission of this testimony was harmful error.

Counsel for the appellant complain bitterly of the charge, saying it is argumentative and gives undue prominence to the claim of the defendants. The charge is long and in the main is a fair statement of

the issues involved and the law applicable thereto.   In
it is found the following:

"In determining whether or not the doctors visited
.the plaintiff as often as they should have visited him,
you are to take into consideration the community in
which the parties lived and the territory which the
doctors had to cover and the number of patients which
they had to visit; for their skill, or lack of skill, their
conduct in giving treatment and in making visits is all
to be determined by you in view of the situation as it
appeared to them at the time and the circumstances
surrounding them and surrounding their patient."

We think it is not the law that doctors can take on
so many patients that they will be excused if they neg-
lect some of them and harm results from the neglect.

The court went quite as far as it should when it said
in its charge:

"I instruct you further that in considering the tes-
timony relative to the visits made by the doctors, that
the doctors alone are the judge of the number of visits
that shall be made and when they shall be made, pro-
vided he used the ordinary judgment of physicians
practicing in the community where he practices or in
similar localities, and there can be no damages for
failure of the defendants to call as often as the plain-
tiff thinks he should, provided the defendants used the
judgment that is ordinarily used by physicians in the
community where he practices, or in similar com-
munities."

For the reasons stated the judgment is set aside and
a new trial ordered, with costs to the plaintiff.

Steere, Brooke, Fellows, Stone, Clark, Bird,
and Sharpe, JJ., concurred.